CLERK'S OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED
JAN 0 8 2007    2008
JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | |
|---|---|
| **DAWN CHEEK,** )<br>Plaintiff, ) | Civil Action No. 2:07cv00008 |
| ) | |
| **v.** ) | **MEMORANDUM OPINION** |
| ) | |
| **MICHAEL J. ASTRUE,** )<br>**Commissioner of Social Security,**[1] )<br>Defendant. ) | By: GLEN M. WILLIAMS<br>SENIOR UNITED STATES DISTRICT JUDGE |

In this social security case, I will vacate the final decision of the Commissioner denying benefits and remand the case to the Commissioner for further consideration.

## I. Background and Standard of Review

The plaintiff, Dawn Cheek, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying Cheek's claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 and § 1381 *et seq.* (West 2003 & Supp. 2007). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3).

The court's review in this case is limited to determining if the factual findings

---

[1] Michael J. Astrue became the Commissioner of Social Security on February 12, 2007, and is, therefore, substituted for Jo Anne B. Barnhart as the defendant in this suit pursuant to Federal Rule of Civil Procedure 25(d)(1).

-1-

of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Cheek protectively filed her current applications for DIB and SSI on or about September 13, 2004, alleging disability as of March 1, 2004,[2] due to Darier's disease, bad nerves, lower back problems, knee surgery, depression and carpal tunnel syndrome. (Record, ("R"), at 16, 48-51, 55, 253-59.) The claims were denied initially and upon reconsideration. (R. at 32-43, 260-64.) Cheek then requested a hearing before an administrative law judge, ("ALJ"). (R. at 44.) The ALJ held a hearing on March 2, 2006, at which Cheek was represented by counsel. (R. at 267-92.)

By opinion dated May 12, 2006, the ALJ denied Cheek's claims. (R. at 15-23.)

---

[2] Although March 1, 2004, is listed on Cheek's application for DIB as the alleged onset date, (R. at 48), the leads/protective filing worksheet lists the onset date as September 6, 2004. (R. at 51.) The court will use the onset date as listed on the claimant's application and the date used by the ALJ in his written opinion.

Also, it should be noted that Cheek did perform work subsequent to the alleged onset date. However, as explained by the ALJ, this work did not constitute substantial gainful activity.

-2-

The ALJ determined that Cheek met the nondisability requirements for a period of DIB set forth in Section 216(i) of the Act and was insured for benefits through the date of his decision. (R. at 21.) The ALJ also determined that Cheek had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 22.) In addition, the ALJ found that Cheek's musculoskeletal impairments related to her knee and low back pain, skin disorder, depression and anxiety were "severe" based on the requirements of 20 C.F.R. §§ 404.1520(b) and 416.920(b). (R. at 22.) However, he found that the impairments did not meet or medically equal one of the listed impairments at Appendix 1, Subpart P, Regulation No. 4. (R. at 22.) Notably, the ALJ determined that Cheek's allegations regarding her limitations were not totally credible. (R. at 22.) Based upon his review of the relevant medical opinions with regard to the severity of Cheek's impairments, the ALJ found that Cheek retained the residual functional capacity to perform simple, low stress jobs in the light work category that would not require standing for more than two hours in a typical eight-hour workday; that would not require greater than frequent postural changes; that would not require Cheek to frequently bend, stoop or crawl; that would not involve exposure to heat, cold or chemicals; and that would not involve interaction with the public. (R. at 22.) As a result, the ALJ determined that Cheek was unable to perform any of her past relevant work. (R. at 22.) Furthermore, the ALJ found that Cheek possessed no transferable skills from any past relevant work and/or that transferability of skills was not an issue in the case at hand. (R. at 22.) Based upon Cheek's age, education and work experience, the ALJ found that Cheek could be expected to make a vocational adjustment to work that existed in significant numbers within the national economy, including jobs such as a clerk, a telephone answerer, an assembler, a hand packer, an administrative support worker, an inspector and a material handler.

-3-

(R. at 22.)  Therefore, the ALJ concluded that Cheek was not under a disability as defined under the Act and was not entitled to benefits.  (R. at 15-23.)  *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2007).

After the ALJ issued his decision, Cheek pursued her administrative appeals and sought review of the ALJ's decision by the Appeals Council.  (R. at 10-11.) However, on November 29, 2006, the Appeals Council denied Cheek's request for review; thereby, making the ALJ's decision the final decision of the Commissioner. (R. at 4-6.)  *See* 20 C.F.R. §§ 404.981, 416.1481 (2007).  Thereafter, Cheek filed this action seeking review of the ALJ's unfavorable decision.  The case is currently before the court on Cheek's motion for summary judgment, (Docket Item No. 14), which was filed on June 29, 2007, and the Commissioner's motion for summary judgment, (Docket Item No. 16), which was filed on July 30, 2007.

## II. Facts

At the time of the ALJ's decision, Cheek was 30 years old, which classified her as a younger person under 20 C.F.R. §§ 404.1563(c), 416.963(c).  (R. at 51, 270-71.) According to the record, Cheek graduated from high school in Kansas; thus, Cheek has a "high school education" pursuant to 20 C.F.R. §§ 404.1564(b)(4), 416.964(b)(4).  (R. at 271.)  Moreover, Cheek has past relevant work as a restaurant worker, a dishwasher in a nursing home, a fast food worker and a cook supervisor. (R. at 275.)

At the hearing before the ALJ on March 2, 2006, Cheek testified that she was

-4-

married and that she had two children. (R. at 270.) Cheek also testified that she was a high school graduate, but acknowledged that, beyond high school, she had not completed any vocational or special training. (R. at 271, 275.) She indicated that she could read and write pretty well, and that she was a licensed driver. (R. at 272.) However, she explained that, if she had to take the driver's license test today, she would need help because she has difficulty taking tests. (R. at 272.) Cheek also explained that depression and overeating caused her weight to fluctuate to as high as 300 pounds. (R. at 271-72.) In addition, she stated that, at the time of the hearing, she was taking certain prescription medications, including Lexapro, Valium and Keflex. (R. at 272.)

Cheek testified that she had a skin disorder called Darier's disease, which she described as a "hereditary disease . . . [that] causes a severe rash in the scalp, facial area, ears [and] chest." (R. at 273.) Cheek further explained that the disorder also caused irritation to her hands, which meant she had to keep her hands out of water and away from certain chemicals to avoid a break out. (R. at 273.) Cheek indicated that she takes Keflex to treat the skin irritation. (R. at 272.) She stated that the medication would clear the rash for a very short time, but despite use of the medication, the irritation recurred. (R. at 275.)

Cheek revealed that, as a child, she was abused both physically and mentally by her father. (R. at 274.) Cheek explained that she had been beaten by her father, which, on one occasion, caused her to be sent to the emergency room. (R. at 274.) Cheek further indicated that the abuse started when she was approximately 10 years old, and lasted until she moved out at age 16. (R. at 264.) Due to the abuse, Cheek

-5-

moved to Kansas to live with an aunt and uncle; however, she noted that she returned to the Virginia/Kentucky area because she was unable to locate another doctor to treat her skin condition properly.  (R. at 275.)

Cheek testified that her past work experience involved work in a nursing home and in the fast food industry.  (R. at 275.)  While working in the nursing home, she worked in the kitchen where she cooked and washed dishes.  (R. at 276.)  She stated that she was able to perform the job adequately, "as long as [she was able to] step outside and get some air" because the heat irritated her skin.  (R. at 276.)  Cheek explained that she has never kept any job for an extended period and stated that "probably the longest time [period she maintained a job] would have been a year." (R. at 276.)  She attributed her inability to maintain employment to depression caused by skin break-outs.  (R. at 276.)  Because of this skin condition, Cheek stated that she was unable to work in public due to her appearance.  (R. at 276.)  She further explained that her condition caused her skin to burn and itch, and that it would break out in "big ol' scabs," which she described as "depressing even to look at."  (R. at 276.)  Cheek also indicated that both hot and cold temperatures irritate her skin condition.  (R. at 277.)

Cheek testified that her last place of employment was at a fast food restaurant as a cook, where she worked until approximately March 2004.  (R. at 277-78.)  She stated that she worked there for five to six months.  (R. at 277, 279.)  She noted that she was unable to continuously perform her duties as a cook because the restaurant rules did not allow her to sit down periodically.  (R. at 279-80.)  Additionally, Cheek explained that she was unable to work the buffet because she experienced

-6-

nervousness when working with the public. (R. at 280.) Furthermore, Cheek testified that the heat from the buffet irritated her skin. (R. at 280.) Cheek also referenced past work at another fast food restaurant. (R. at 278.) She testified that she quit this particular job due to the stress caused by her skin condition. (R. at 278.) Further, Cheek stated that she worked for one day as a telemarketer, but did not continue because of her inability to understand the computer system. (R. at 278.)

Cheek pointed out that she needed to sit down periodically due to lower back pain. (R. at 280.) Cheek noted that she had been seeing a doctor for approximately four years regarding her back pain. (R. at 280.) However, she explained that no surgery was needed to correct her back problems. (R. at 280.) Cheek also stated that she suffered from severe carpal tunnel disease in both hands. (R. at 280.) Cheek testified that, in addition to pain and numbness, her carpal tunnel condition caused her to drop things. (R. at 281.) She remarked that her hands usually go numb about two times per day, for approximately five to 10 minutes. (R. at 281.) Cheek stated that, following the numbness, her hands throb with pain. (R. at 281.) She indicated that the numbness and pain associated with this condition would be irritated if she was required to use her hands at work. (R. at 282.)

Cheek testified that she also experienced knee problems. She stated that she underwent knee surgery in 1992 due to a fall. (R. at 282.) Because of the injury, she indicated that she could only stand for approximately 20-25 minutes before she has to sit down. (R. at 282.) Cheek explained that after standing for 20-25 minutes, she would then have to sit and rest for about 15-20 minutes. (R. at 282.) Cheek further explained that she would need to be able to move around quite a bit even if she was

-7-

working at a workstation.  (R. at 283.)  She testified that she would need to move around "[t]o get [her] joints moving because [sitting] for too long" would cause stiffness.  (R. at 283.)

Cheek stated that she saw a counselor at the Western Lee County Health Clinic for depression.  (R. at 284.)  In describing her depression, she noted that certain things upset her, causing her to cry.  (R. at 284.)  Cheek explained that the crying spells can happen up to two times per day.  (R. at 284.)  She also recalled having difficulty controlling her emotions when she worked because of problems with co-workers or customers.  (R. at 285.)  Cheek testified that she would have to go to the restroom for 10-15 minutes to gather herself.  (R. at 285.)

Cheek claimed that she did not drive herself to the hearing and explained that, although she has a valid driver's license, she could not have driven herself because of a certain medication she had been prescribed.  (R. at 286.)  She testified that she had been prescribed Valium and that she took two 10 milligram doses per day.  (R. at 286.)  Cheek opined that taking Valium would impact her ability to work because it makes her sleepy.  (R. at 286.)  Similarly, she testified that she would not even be able to maintain a "real easy job" because she normally has to lay down in the afternoons due to her medication.  (R. at 286.)  Specifically, she indicated that she usually sleeps approximately two hours during the day due to the side effects of the medication.  (R. at 286.)

Cheek testified that she cannot easily bend and that she could not stoop.  (R. at 287.)  Likewise, she stated that her knee problems prohibited her from crawling

-8-

because she is unable to put "hardly any" weight on her knee. (R. at 287.) While at the hearing, Cheek remarked that her back was hurting from sitting in the chair, which caused her to stand for relief. (R. at 287.)

The ALJ then briefly questioned Cheek. He asked whether Cheek had seen her counselor since August 2005, to which Cheek responded affirmatively. (R. at 287.) During the August 2005 visit, the records indicated that Klonopin had been previously prescribed to Cheek, but that it had been discontinued because the medication apparently made Cheek feel worse. (R. at 287.) However, since the change in medication, Cheek stated that her depression had remained the same. (R. at 287.) The ALJ also inquired about certain details of Cheek's work history. (R. at 288.) Specifically, he noted that the record indicated that Cheek had previously worked as a caregiver. (R. at 288.) Cheek explained that she was paid to care for her aunt for a few months in 1998. (R. at 288.) The ALJ also asked about Cheek's work as a cook in a nursing home, as it was his understanding that Cheek worked in a supervisory role. (R. at 288.) Cheek acknowledged that she worked in a supervisory capacity, but noted that she simply assisted the "main woman" and "wasn't ever left alone." (R. at 288.)

Cathy Sanders, a vocational expert, also testified at Cheek's hearing. (R. at 288-91.) Sanders acknowledged that the ALJ and Cheek's counsel had sufficiently reviewed Cheek's educational and work background. (R. at 288-89.) Sanders identified Cheek's employment as a restaurant worker, fast food worker and

dishwasher as unskilled, light work.[3] (R. at 289.) Sanders then identified Cheek's work as a cook supervisor as semi-skilled, light work. (R. at 289.) Sanders found that Cheek's work as a caregiver did not qualify in terms of relevant amount of time because the work only lasted eight weeks. (R. at 289.)

Sanders was asked to assume a hypothetical claimant of the same age and educational background as Cheek, who was restricted to the demands of light work. (R. at 290.) In addition, the hypothetical claimant would be unable to stand for more than two hours in a typical eight-hour workday, and would require a job that would allow frequent postural changes. (R. at 290.) Furthermore, the claimant would be unable to perform a job that required frequent bending, stooping or crawling. (R. at 290.) The ALJ also noted that this particular claimant could not be exposed to excessive heat, cold or chemicals, and that she would be limited to simple low stress jobs that would not require her to interact with the general public. (R. at 290.) Based upon the previously mentioned restrictions, Sanders was asked if there were any jobs within the regional or national economies that an individual with those limitations could perform. (R. at 290.) Sanders opined that there were several jobs within the regional and national economies which this hypothetical individual could perform, including sedentary jobs such as an assembler, a hand packager, a material handler, a clerk and a telephone answerer. (R. at 290.) However, Sanders indicated that, if the hypothetical claimant's pain or depression, or combination thereof, frequently interfered with her ability to concentrate or persist at work tasks, the claimant would

---

[3] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can do light work, she also can do sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2007).

-10-

not be able to perform the previously mentioned jobs. (R. at 290.) Lastly, Sanders noted that her testimony was consistent with the Dictionary of Occupational Titles. (R. at 290.)

In rendering his decision, the ALJ reviewed records from Horton Community Hospital; Atchison Hospital; Dr. Tom L. Shriwise, M.D.; Western Lee County Health Clinic; Dr. Robert Alexander Jr., M.D.; Dr. Jai Varandani, M.D.; Dr. Frank M. Johnson, M.D.; Dr. Donald R. Williams, M.D.; Louis A Perrott, Ph.D.; R.J. Milan Jr., PhD.; Lee Regional Medical Center; and Dr. Ann Marie Mackway-Girardi, D.O.

The medical records relevant to Cheek's allegedly disabling conditions begin when she presented to the emergency room of the Atchison Hospital on December 22, 1991. (R. at 155.) Cheek was involved in an altercation with her father and claimed that he struck her with a shovel. (R. at 155.) Cheek complained of left breast pain and pain in both hands. (R. at 155.) The medical records described an abrasion and bruising over the left breast; swelling of the palm of Cheek's right hand near her thumb; abrasions to her left hand; and slight swelling of the palm on her left hand near the thumb with a small abrasion to the fifth digit. (R. at 155.) The attending physician ordered x-rays of each hand and the chest; however, both x-rays revealed no fractures.[4] (R. at 155.) Cheek was instructed to follow up and to take extra strength Tylenol for her pain. (R. at 155.)

Cheek again presented to the Atchison Hospital emergency room on December

[4] Portions of the emergency room records from the December 22, 1991, visit are largely illegible. (R. at 155.)

4, 1992, due to a fall that occurred two days prior. (R. at 156-62.) Cheek complained of knee pain and swelling, as well as difficulty in bearing weight. (R. at 156.) Upon examination, she was diagnosed with a depressed, split left lateral tibial plateau fracture. (R. at 156.) Cheek was admitted to the hospital and surgery was performed on the same day to address the injury. (R. at 156.) Cheek underwent surgical fixation of the lateral tibial plateau, which required iliac crest bone grafting. (R. at 156.) Following surgery, Cheek was placed on a pain pump with a continuous passive motion machine, ("CPM unit"). (R. at 156.) In addition, Cheek was placed in a hinged knee brace designed to take pressure off the lateral tibial plateau during physical therapy. (R. at 156.) The medical records indicated that Cheek tolerated physical therapy at times; however, she failed to tolerate gait on stairs. (R. at 156.) Thus, it was determined that Cheek should not proceed with stair climbing due to her physical limitation. (R. at 156.) Furthermore, Cheek's range of motion in her protective brace was limited because of her obesity. (R. at 156.)

Dr. Tom L. Shriwise, M.D., the surgeon, explained that due to her lack of range of motion, Cheek would need to follow up with physical therapy as an outpatient or obtain a home CPM unit. (R. at 156.) Cheek was discharged on December 9, 1992, and was instructed to apply for a home CPM unit, which would assist in the improvement of her range of motion and prevent frequent trips to the hospital for physical therapy. (R. at 156.) Cheek was further instructed to remove her brace for range of motion exercises to maintain her present range of motion until she received approval for a home unit, at which time her range of motion would be progressively increased with nightly use of the CPM unit. (R. at 156.) Cheek was told to only remove the brace for exercises, bathing and dressing. (R. at 156.) Cheek was

-12-

prescribed Tylenol #3 for pain control and was advised to continue non-weight bearing for a total of three to four months. (R. at 156.) Lastly, Cheek was told to return for a follow-up appointment to have the staples removed from her knee. (R. at 156.)

Cheek continued to see Dr. Shriwise from December 15, 1992, to May 3, 1993, for post-operative treatment. (R. at 163-64.) On December 15, 1992, Dr. Shriwise noted that Cheek was doing "okay," with minimal pain reported. (R. at 164.) He indicated that the incisions were healed and that the staples had been removed. (R. at 164.) Dr. Shriwise also reported that Cheek's flexibility was 10 to 20 degrees, passive. (R. at 164.) Cheek was advised to continue with home physical therapy to improve her range of motion. (R. at 164.) Cheek again presented to Dr. Shriwise on January 15, 1993. (R. at 164.) At this visit, Cheek's range of motion was noted as "quite good from 0 to 100 degrees" and her x-rays were satisfactory. (R. at 164.) She was instructed to continue her progressive range of motion exercises and to maintain non-weight bearing status for at least six more weeks. (R. at 164.) Dr. Shriwise ordered Cheek to discontinue the home physical therapy and to continue working on her range of motion on her own. (R. at 164.)

Cheek saw Dr. Shriwise again on February 22, 1993, and Cheek did not report any complaints or pain. (R. at 163.) Cheek's range of motion had improved and Dr. Shriwise noted that she had good quad strength with straight leg raising. (R. at 163.) Cheek was once again instructed to continue with non-weight bearing status. (R. at 163.) Cheek also presented to Dr. Shriwise on May 3, 1993, and no left knee pain was reported. (R. at 163.) Cheek indicated that she wanted to attempt to walk

-13-

without her crutches. (R. at 163.) Dr. Shriswise reported excellent motion with lateral click over the lateral joint line, which was not tender. (R. at 163.) Dr. Shriwise noted that there was slightly more valgus on the left of the knee as compared to the right. (R. at 163.) Cheek was instructed to progress out of the crutches and to follow up in one year. (R. at 163.)

Cheek sought treatment at various times from November 13, 2001, to August 12, 2005, at the Western Lee County Health Clinic. (R. at 165-193.) On November 13, 2001, Cheek presented and explained that she had twisted her left ankle. (R. at 190.) The medical records of Dr. Ann Marie Mackway-Girardi, D.O., indicated that Cheek was walking on the ankle with "great care." (R. at 190.) Upon examination of the left ankle, edema was noted at the lateral malleolus and tenderness was also observed at the lateral mallelous. (R. at 189.) Active supination, pronation and dorsiflexion were limited to a few degrees because of pain. (R. at 189.) The mortice appeared to be stable with no laxity of the ankle noted. (R. at 189.) Further examination revealed a fracture of the left ankle. (R. at 189.) She was given crutches and prescribed Vioxx for pain. (R. at 189.) Cheek was referred to Dr. Dubin,[5] and also was advised to return for a follow-up in two weeks. (R. at 189.) Dr. Mackway-Girardi also expressed concern as to Cheek's obesity and reported a body mass index of 40. (R. at 189.) In addition, Dr. Mackway-Girardi noted that Cheek had a history of left ankle inversion injury and that Cheek opined that the ankle had been fractured before. (R. at 189.)

---

[5] Dr. Dubin was referenced several times in Dr. Mackway-Girardi's reports. However, the record does not contain written documentation reflecting any treatment received by Cheek, other than the fact that Dr. Mackway-Girardi referred Cheek to Dr. Dubin and that Cheek eventually saw Dr. Dubin regarding an ankle injury.

-14-

Cheek saw Dr. Mackway-Girardi again on November 30, 2001. (R. at 187.) Cheek complained of a left ankle injury and mouth soreness. (R. at 187-88.) Dr. Mackway-Girardi reported that Cheek was in mild discomfort, suffering from jaw pain, which was secondary to impacted wisdom teeth. (R. at 187.) Moreover, a left fibula fracture also was reported. (R. at 187.) With regards to the jaw pain, Cheek was prescribed Vioxx for pain and Amoxicillin for infection. (R. at 187.) Dr. Mackway-Girardi emphasized that Cheek needed to see a dentist as soon as possible and provided a referral. (R. at 187.) As for the left fibula fracture, Cheek was once again referred to Dr. Dubin and was instructed to see him soon. (R. at 187.) Dr. Mackway-Girardi noted that Cheek did not follow the November 13, 2001, recommendation to see Dr. Dubin; thus, Cheek was once again urged to make an appointment with his office. (R. at 186-87.) Cheek saw Dr. Dubin on December 3, 2001, and her left ankle was examined. (R. at 187.)

On March 11, 2002, Cheek sought treatment from Dr. Mackway-Girardi regarding a left ankle injury sustained while stepping off a porch. (R. at 187.) Cheek was in mild discomfort, but was not using the crutches that had been given to her. (R. at 186.) No bruising was reported, but the left ankle was slightly tender. (R. at 186.) Additionally, Dr. Mackway-Girardi observed edematous at the lateral surface of the left ankle and indicated that the left ankle was possibly fractured. (R. at 186.) Cheek was again referred to Dr. Dubin and was given Tylenol for pain. (R. at 186.) Cheek also was advised to use her crutches until she saw Dr. Dubin and received further instructions. (R. at 186.) Dr. Mackway-Girardi emphasized the importance of seeing Dr. Dubin for treatment and instructed Cheek to return in one month for regular care. (R. at 186.)

-15-

Cheek presented to the Western Lee County Health Clinic on December 11, 2002, and complained of a recurrent skin condition known as Darier's disease. (R. at 186.) Cheek explained that she had a history of problems with the disease and that it had worsened due to stress and nerves. (R. at 186.) Furthermore, Cheek indicated that the skin condition would flare up when exposed to the sun. (R. at 185.) Cheek reported that she had been under emotional stress and that she had experienced anxiousness and nervousness, which was related to certain situational factors. (R. at 185.) However, she stated that she was not chronically depressed or anxious and denied any suicidal ideations. (R. at 185.) Lastly, Cheek explained that her appetite had decreased and that she was having difficulty sleeping. (R. at 185.) Upon examination, hyperpigmented keratoses of the mid-chest, shoulders and hairline was reported. (R. at 185.) Cheek was described as mildly anxious. (R. at 185.) Cheek's problems were attributed to her skin condition and situational stress. (R. at 185.) She was prescribed hydroxyzine hydrochloride for itching and nervousness and was given Retin-A cream to apply to her rash. (R. at 185.) It was suggested that Cheek follow up with a dermatologist and Cheek was referred to the behavioral health unit for counseling. (R. at 185.)

On May 1, 2003, Cheek saw Dr. Mackway-Girardi regarding her skin condition and anxiety. (R. at 181.) Dr. Mackway-Girardi noted that Cheek appeared to be uncomfortable. (R. at 181.) A rash was observed on the left arm, extensor surface, anterior and posterior chest that consisted of confluent macules and papules. (R. at 181.) The macules and papules were erythematous with a dull cyanotic tone. (R. at 181.) While Cheek's skin was intact, raw areas were present on the claimant's left cheek. (R. at 181.) In order to treat Cheek's skin condition, Dr. Mackway-Girardi

-16-

prescribed Cheek a Medrol Dose Pak and Keflex. (R. at 181.) Cheek was prescribed Periactin to relieve the itching and burning associated with Darier's disease. (R. at 181.) In addition, Cheek was referred to a dermatologist. (R. at 181.) Cheek requested that she be prescribed Valium or Xanax to treat her anxiety. (R. at 181.) However, Dr. Mackway-Girardi prescribed Prozac instead. (R. at 181.) Cheek also was prescribed Toprol to help control her hypertension and "tone down" her nerves. (R. at 181.) Dr. Mackway-Girardi suggested that Cheek follow up in one month. (R. at 181.) Cheek's next relevant visit to Dr. Mackway-Girardi was on February 6, 2004. (R. at 179-80.) Among other things, Cheek was treated for an anxiety disorder. (R. at 179.) Cheek continued on Prozac and was prescribed Buspar for a two week period. (R. at 179.)

According to the medical records, Cheek did not seek treatment at the Western Lee County Health Clinic again until May 24, 2005. (R. at 176.) At that time, Cheek was asked to identify any problems she had experienced since her last visit in February 2004. (R. at 176.) She indicated that she had experienced back pain, skin soreness/rash, tiredness, numbness and tingling, nervousness and irritability. (R. at 176.) Dr. Mackway-Girardi reported that Cheek was tearful at times during the visit and that she had a rash with some papules on her forehead and cheeks. (R. at 175.) Brown pigmentation was observed between Cheek's breasts. (R. at 175.) In her assessment, Dr. Mackway-Girardi noted Darier's disease, depression, fatigue and carpal tunnel disease with a positive Tinel's sign. (R. at 175.) Cheek was referred to Dr. Parsons, a dermatologist, for her Darier's disease. (R. at 175.) She was prescribed Atarax to relieve the itching and she elected not to begin the Medrol Dose Pak so that Dr. Parsons would have a better idea of the seriousness of the skin

-17-

condition. (R. at 175.) Cheek was prescribed Lexapro to treat her depression, and was prescribed Valium to take until the Lexapro began to help. (R. at 175.) A complete blood count and a thyroid-stimulating hormone test was ordered to address Cheek's fatigue. (R. at 175.) Cheek also was shown carpal tunnel stretching exercises and was prescribed carpal tunnel cock-up wrist splints to wear while sleeping. (R. at 175.)

On June 27, 2005, an Initial Behavioral Health Evaluation Consultation was conducted at the Western Lee County Health Clinic by Kaye Weitzman. (R. at 170-72.) During the evaluation, Cheek identified the following symptoms: depression; tearfulness; appetite disturbance, i.e. stress increases appetite; difficulty concentrating; social isolation; activity withdrawal; headaches; anxiety; fears/phobias; shakiness/trembling; fatigue; irritability/on edge; some hopeless/helpless feelings; some anger/frustration; issues of loss; stress; unable to work due to depression; easily annoyed; and tendency to argue. (R. at 170.) Cheek claimed that she was slow to process things and that she had a poor memory. (R. at 170.) Weitzman noted that, as a teen, Cheek had undergone mental health treatment and that she had a very abusive father. (R. at 170.) Cheek's mood was reported to be depressed and anxious, while her affect was normal and her memory was said to be intact. (R. at 172.) No suicidal or homicidal ideations were noted. (R. at 172.) Cheek's judgment and impulse control were both listed as fair. (R. at 172.) Weitzman assessed Cheek's Global Assessment of Functioning, ("GAF"), score at 45, and noted a past score of 70.[6] Weitzman recommended self-esteem enhancement, a

---

[6] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC

-18-

medication evaluation, stress management and coping improvement. (R. at 172.) Following the evaluation, Weitzman also recommended an increase in Valium or, in the alternative, a trial of Klonopin. (R. at 172.)

On July 13, 2005, Cheek saw Dr. Mackway-Girardi and complained of back pain, bad nerves and a worsening of her skin condition. (R. at 168.) Cheek indicated that her skin was hot and "very itchy." (R. at 168.) Dr. Mackway-Girardi noted that Cheek looked "quite uncomfortable" on this visit. (R. at 167.) Cheek's blood pressure was elevated during this visit, which was attributed to her discomfort. (R. at 167.) Dr. Mackway-Girardi reported that tenderness was present across the sacroiliac joints bilaterally and into the low lumbar area. (R. at 167.) Cheek's skin condition was reportedly worse on her back, with eruption across her shoulders posteriorly. (R. at 167.) A follicular pattern was observed, which was very close packed and warm to the touch. (R. at 167.) Dr. Mackway-Girardi's assessment included Darier's disease with exacerbation, sacroiliac pain and an anxiety disorder. (R. at 167.) Cheek was prescribed a Medrol Dose Pak and Keflex to treat her skin condition. (R. at 167.) An x-ray was ordered to assess Cheek's sacroiliac pain and she was given Tylenol #3 for pain. (R. at 167.) Dr. Mackway-Girardi also recommended either Anabar or Flexeril. (R. at 167.) Cheek was instructed to continue taking Lexapro for anxiety and also was prescribed Klonopin. (R. at 167.) Doxepin was prescribed to address Cheek's itching and depression. (R. at 167.)

AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994.) A GAF score of 41-50 indicates "[s]erious symptoms . . . OR any serious impairment in social, occupational, or school functioning." DSM-IV at 32. A GAF score of 61-70 indicates "[s]ome mild symptoms . . . OR some difficulty in social, occupation, or school functioning . . . but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV at 32.

-19-

On August 1, 2005, Cheek again saw Weitzman at the Western Lee County Health Clinic. (R. at 166.) Cheek reported that the Klonopin she had been prescribed made her feel worse, causing irritability and muscle tightness. (R. at 166.) She indicated that she stopped taking the Klonopin after approximately one to two weeks. (R. at 166.) Cheek also mentioned financial concerns and indicated that she was overwhelmed. (R. at 166.) Weitzman noted that Cheek was cooperative during the session. (R. at 166.) Weitzman further discussed the side effects of Klonopin with Cheek. (R. at 166.) During that discussion, Cheek informed Weitzman that, in the past, Cheek had experienced positive results with Valium. (R. at 166.) Weitzman opined that another trial of Valium may be warranted. (R. at 166.) Further, Weitzman noted that "disinhibitation" can occur with Klonopin. (R. at 166.) Cheek appeared to request a high dose of whatever was to be prescribed. (R. at 166.) Cheek was prescribed Valium 10 milligram by Dr. Mackway-Girardi and was instructed not to drive after taking this medication. (R. at 166.)

Cheek sought treatment from Dr. Robert Alexander, Jr., M.D., from May 22, 2003, to May 10, 2004. (R. at 194-210.) Dr. Alexander saw Cheek regarding her skin condition and prescribed various medications in an attempt to treat the symptoms.[7] (R. at 194-98.) Dr. Alexander reported improvement with medication and noted dramatic improvement on October 22, 2003. (R. at 196.)

A consultative examination was conducted by Dr. Jai Varandani, M.D., on November 18, 2004. (R. at 211-17.) Cheek presented with complaints of Darier's disease, bad nerves, low back pain, depression and knee pain. (R. at 211.) Cheek

[7] Dr. Alexander's medical records are largely illegible. (R. at 194-98.)

explained that she had a history of knee problems dating back to 1992 when she had surgery due to a knee injury. (R. at 211.) She further explained that following the surgery her knee bothered her somewhat, but she continued to work and do odd jobs. (R. at 211.) However, she stated that her knee had been hurting more recently, especially when she stands for extended periods or if the weather is damp and cold. (R. at 211.) Cheek informed Dr. Varandani that she has experienced swelling and pain to the left knee and that she sometimes "gets a feeling that she is going to fall." (R. at 211.) Despite this feeling, she only reported one fall. (R. at 211.) Cheek indicated that her knee discomfort did not cause sleep disturbance. (R. at 211.)

Cheek revealed that her biological father abused her by physically "beating on her back." (R. at 211.) She indicated that this type of abuse occurred from age 10 to age 15. (R. at 211.) Cheek explained that this physical abuse contributed to her current back pain. (R. at 211.) Furthermore, she reported that when she bends or lifts heavy objects she experiences a burning sensation over the thoracic or lumbar spine. (R. at 211.) However, Dr. Varandani noted that Cheek had never reported this complaint to any other physician. (R. at 211.) Cheek denied paraesthesia, weakness or loss of balance of the lower extremities. (R. at 211.)

With regards to Cheek's skin condition, she explained that the condition first began at age 13. (R. at 212.) She stated that the condition causes a burning sensation at the scalp that is intensified when touched. (R. at 212.) Cheek remarked that the condition causes a scaly break-out over the scalp and around her ears and neck posteriorly and anteriorly. (R. at 212.) Dr. Varandani noted that Cheek had not sought treatment from a dermatologist until Dr. Mackway-Girardi referred her to one.

-21-

(R. at 212.)  At the time of Dr. Varandani's evaluation, Cheek had ceased taking previously prescribed medications such as paroxetine or Valium because she had no insurance coverage.  (R. at 212.)

Cheek also alleged that she suffered from bad nerves and that she becomes upset very easily.  (R. at 212.)  She complained of depression, crying spells and restlessness.  (R. at 212.)  Cheek informed Dr. Varandani that her two children were "problem children" and that she sometimes felt overwhelmed with feelings of helplessness.  (R. at 212.)  Cheek did not show any suicidal intent.  (R. at 212.)  Cheek stated that she had the ability to walk for about one mile and that she could stand for one half an hour before her back begins to hurt.  (R. at 212.)  She acknowledged that she had no difficulty lifting or reaching above her head.  (R. at 212.)

Dr. Varandani noted that Cheek walked into the office unassisted and was not in acute distress.  (R. at 212.)  Cheek was reportedly alert, awake and oriented.  (R. at 212.)  Moreover, she was observed to be cooperative during the examination.  (R. at 212.)  Upon examination, Cheek's lungs were clear to auscultation and her cardiovascular, neurological, abdominal and upper extremity exams were normal.  (R. at 213.)  As for her lower extremities, Cheek's deep tendon reflexes were normal and her sensation to touch was intact.  (R. at 213.)  Her power was bilaterally normal and no muscular wasting was noted.  (R. at 213.)  Cheek's ankle and patellar clonis were absent.  (R. at 213.)  There were no signs that suggested cerebellar deficiency and Romberg's sign was negative.  (R. at 213.)  A muscular skeletal exam revealed no inflammatory changes over the large or small joints.  (R. at 213.)  Dr. Varandani

noted mild tenderness to the left knee and both the medial and lateral joint line. (R. at 213.) However, despite the tenderness, no swelling was observed. (R. at 213.) Cheek's range of motion was unrestricted. (R. at 213.) An excoriated lesion was present over the left external auditory canal, pinna and at the post auriclar area, as well as over the mastoid region on the left side. (R. at 213.) On the right ear, Cheek had a small amount of excoriation, particularly at the ridge of the pinna. (R. at 213.) Fluid was noted at both lesions and there was scab formation. (R. at 213.) There was no active bleeding of the skin and no erythema or edema was noted. (R. at 213.) Dr. Varandani did not see any breach in the continuity of Cheek's skin or any other lesions in the other inter-scapular areas mentioned by Cheek, except for slight, relatively increased hyperpigmentation and mascular lesions. (R. at 213.) Dr. Varandani also found that Cheek's Drier's sign was negative. (R. at 213.)

Dr. Varandani's clinical impression revealed chronic left knee pain, chronic back pain, which he identified as likely degenerative joint disease, excoriated skin lesions over both external ears, mild anxiety/depression and obesity. (R. at 213.) He opined that the skin lesions appeared to be of chronic nature. (R. at 214.) Dr. Varandani also ordered x-rays of the lumbar spine and the left knee. (R. at 215.) The x-ray of the left knee showed an old injury in the lateral tibial plateau and post-surgical change with associated moderate degree of degenerative change in the left knee. (R. at 217.) The x-ray of the lumbar spine revealed minimal degenerative change with osteophyte at L4 and no other significant abnormalities were identified. (R. at 217.) Dr. Varandani also conducted a range of motion evaluation, which reported normal range of motion in all tested areas, including the knee, ankle, cervical spine and dorsolumbar spine. (R. at 215-16.)

-23-

On February 15, 2005, Dr. Frank M. Johnson, M.D., a state agency physician, performed a Physical Residual Functional Capacity Assessment, ("PRFC"). (R. at 218-24.) Dr. Johnson determined that Cheek was capable of lifting and/or carrying items weighing up to 20 pounds occasionally, and that she possessed the ability to frequently lift and/or carry items weighing up to 10 pounds. (R. at 219.) Dr. Johnson also found that Cheek could stand and/or walk for a total of about six hours in a typical eight-hour workday. (R. at 219.) Likewise, he found that Cheek was capable of sitting for a total of about six hours in a typical eight-hour workday. (R. at 219.) Cheek was found to be limited in her ability to push and/or pull with her lower extremities due to her knee problems. (R. at 219.) No postural, manipulative, visual, communicative or environmental limitations were noted. (R. at 220-21.) Dr. Johnson found that Cheek had provided inconsistent information regarding her daily activities. (R. at 224.) He also noted that, at the time of his evaluation, Cheek had not sought recent treatment for her impairments, which he largely attributed to limited income and lack of medical insurance. (R. at 224.) Based upon the evidence within the record, Dr. Johnson determined that Cheek's statements regarding her symptoms and abilities were only partially credible. (R. at 224.) Dr. Donald R. Williams, M.D., reviewed Dr. Johnson's report and affirmed his findings on April 11, 2005. (R. at 224.)

On February 15, 2005, Louis A. Perrott, Ph.D, a state agency physician, conducted a Psychiatric Review Technique Form, ("PRTF"). (R. at 225-238.) Perrott found that Cheek's impairments were not severe and that she suffered from coexisting non-mental impairments that required referral to another medical specialty. (R. at 225.) Perrott identified an affective disorder, diagnosing Cheek with a medically

-24-

determinable impairment that did not precisely satisfy the diagnostic criteria listed in the affective disorders section of the PRTF. (R. at 228.) Perrott determined that Cheek suffered from depression, per non-psychiatric TP. (R. at 228.) In addition, Perrott reported that Cheek had a disorder that did not precisely satisfy the diagnostic criteria listed in the anxiety-related section of the PRTF, which he identified as anxiety, per non-psychiatric TP. (R. at 230.) Cheek was found to have no limitation restricting her activities of daily living and no limitation in her ability to maintain concentration, persistence or pace. (R. at 235.) No episodes of decompensation were noted. (R. at 235.) Perrott did determine that Cheek had mild limitations in maintaining social functioning. (R. at 235.) After reviewing the relevant medical records, Perrott found that Cheek's allegations were only partially credible. (R. at 237.) Perrott concluded that Cheek did not have a severe mental impairment and that there was no evidence of referral or treatment by a mental health professional. (R. at 237.) Furthermore, he noted that any major limitations as to her level of adaptive functioning were not the result of her emotional conditions. (R. at 237.) Lastly, Perrott acknowledged that her anxiety and depression may have some adverse impacts upon her ability to work; however, he opined that she remained capable of performing simple work activities. (R. at 237.) R. J. Milan, Ph.D., reviewed Perrott's report and affirmed his findings on April 8, 2005. (R. at 225.)

In response to an inquiry from Cheek's counsel dated February 16, 2006, Dr. Mackway-Girardi, Cheek's treating physician, opined that the symptoms alleged by Cheek could reasonably be expected to occur based upon her clinical observations and the medical findings and records available. (R. at 252.) Furthermore, Dr. Mackway-Girardi indicated that, based upon Cheek's impairments, resulting

-25-

symptoms and medications, Cheek could not sustain work activity on a regular and consistent basis. (R. at 252.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2006); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* C.F.R. §§ 404.1520, 416.920 (2007). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in the process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2007).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy the burden, the Commissioner must then establish that the claimant maintains the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2007); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

-26-

By opinion dated May 12, 2006, the ALJ denied Cheek's claims. (R. at 15-23.) The ALJ determined that Cheek met the nondisability requirements for a period of DIB set forth in Section 216(i) of the Act and was insured for benefits through the date of his decision. (R. at 21.)  The ALJ also determined that Cheek had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 22.) In addition, the ALJ found that Cheek's musculoskeletal impairments related to her knee and low back pain, skin disorder, depression and anxiety were "severe" based on the requirements of 20 C.F.R. §§ 404.1520(b) and 416.920(b).  (R. at 22.) However, he found that the impairments did not meet or medically equal one of the listed impairments at Appendix 1, Subpart P, Regulation No. 4. (R. at 22.) Notably, the ALJ determined that Cheek's allegations regarding her limitations were not totally credible. (R. at 22.)  Based upon his review of the relevant medical opinions with regard to the severity of Cheek's impairments, the ALJ found that Cheek retained the residual functional capacity to perform simple, low stress jobs in the light work category that would not require standing for more than two hours in a typical eight-hour workday; that would not require greater than frequent postural changes; that would not require Cheek to frequently bend, stoop or crawl; that would not involves exposure to heat, cold or chemicals; and that would not involve interaction with the public. (R. at 22.) As a result, the ALJ determined that Cheek was unable to perform any of her past relevant work. (R. at 22.)  Furthermore, the ALJ found that Cheek possessed no transferable skills from any past relevant work and/or that transferability of skills was not an issue in the case at hand. (R. at 22.)  Based upon the Cheek's age, education and work experience, the ALJ ruled that Cheek could be expected to make a vocational adjustment to work that existed in significant numbers within the national economy, including jobs such as a clerk, a telephone answerer, an assembler,

-27-

a hand packer, an administrative support worker, an inspector and a material handler. (R. at 22.) Therefore, the ALJ concluded that Cheek was not under a disability as defined under the Act and was not entitled to benefits. (R. at 15-23.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2007).

Cheek argues that the ALJ's opinion failed to take into consideration the effects of her medical treatment when he determined her residual functional capacity. (Plaintiff's Memorandum in Support of Motion for Summary Judgment, ("Plaintiff's Brief"), at 6-8.)    Essentially, Cheek argues that a residual functional capacity assessment must be based upon all relevant evidence within the record, including the effects of treatment upon a claimant. (Plaintiff's Brief at 7.)    Specifically, Cheek contends that the ALJ did not properly consider the side effects Cheek allegedly experienced from taking Valium. (Plaintiff's Brief at 6-7.)

The court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings.    This court must not weigh the evidence, as this court lacks the authority to substitute its judgment for that of the Commissioner, provided that his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456.  In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence.  *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

It is well-settled that the ALJ has a duty to weigh the evidence, including the

-28-

medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Specifically, the ALJ must indicate explicitly that he has weighed all relevant evidence and must indicate the weight given to this evidence. *See Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979). While an ALJ may not reject medical evidence for no reason or for the wrong reason, see *King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on facts set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

Cheek's sole argument is that the ALJ failed to properly consider the effects of her treatment, namely the side effects of the medication Valium, which was prescribed to treat her anxiety and depression. (Plaintiff's Brief at 6-8.) Cheek's counsel points out that, at the time of the hearing, Cheek was taking Valium. Specifically, Cheek testified that she took two 10 milligram doses per day. (R. at 286.) However, she noted that the Valium caused drowsiness, forcing her to sleep for approximately two hours every afternoon. (R. at 286.) Cheek stated that the medication "help[ed] calm [her] nerves" to the point that she is not "so agitated." (R. at 286.) Despite this benefit, the Valium allegedly caused her to become very tired. (R. at 286.) As noted by Cheek's counsel, Cheek testified that she was unable to drive to her disability hearing due to the side effects of the medication. (R. at 286.) Cheek explained that she was strictly prohibited from driving when taking Valium. (R. at 286.) The medical records indicate that Cheek was prescribed Valium by Dr. Mackway-Girardi and that Cheek was instructed not to drive after taking the

-29-

medication. (R. at 166.)

The court recognizes that Cheek has not been treated with Valium for an extensive period of time. In addition, the court realizes that the side effects are simply subjective allegations that were not reported to any medical professional. Nonetheless, as cited by the claimant, Social Security Ruling 96-8p clearly states that a residual functional capacity assessment "must be based on *all* of the relevant evidence in the case record, such as . . . .[t]he effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication)." Social Security Ruling (SSR), 96-8p, 1996 LEXIS 5, *14. Continuing, the adjudicator "must consider all allegations of physical and mental limitations or restrictions and make every reasonable effort to ensure that the file contains sufficient evidence to assess [the claimant's residual functional capacity]." SSR 96-8p, 1996 LEXIS at *14. SSR 96-8p requires careful consideration of all available evidence regarding symptoms "because subjective descriptions may indicate more severe limitations or restrictions than can be shown by objective medical evidence alone." SSR 96-8p, 1996 LEXIS at *14. Therefore, the ALJ has a duty to consider all relevant medical evidence, as well as all relevant allegations set forth by the claimant.

In this case, the ALJ found that Cheek retained the residual functional capacity to perform simple, low stress jobs in the light work category that would not require standing for more than two hours in an eight-hour workday; that would not require greater than frequent postural changes; that would not require the claimant to frequently bend, stoop or crawl; that would not involve exposure to heat, cold or

-30-

chemicals; and that would not involve interaction with the public. (R. at 22.) Similarly, at the hearing, a hypothetical was posed to the vocational expert outlining the previously mentioned limitations. (R. at 290.) There is no evidence to suggest that the ALJ based his residual functional capacity finding upon *all* the relevant evidence because there is no mention of Cheek's effects of treatment, i.e. the alleged side effects from Valium. At no point in the ALJ's written opinion or in the hypothetical posed to the vocational expert did the ALJ mention Cheek's alleged side effects to Valium. It is entirely possible that the ALJ, who found Cheek's allegations to be only partially credible, decided to discount her testimony regarding the side effects of the medication, as it is the province of the ALJ to assess the credibility of a claimant. *See Hays*, 907 F.2d at 1456. As such, "[b]ecause [the ALJ] had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shivley v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984). Ordinarily, this court will not disturb the ALJ's credibility findings unless "it appears that [his] credibility determinations are based on improper or irrational criteria." *See Breeden v. Weinberger*, 493 F.2d 1002, 1010 (4th Cir. 1974.) Here, it is not clear whether the ALJ disregarded Cheek's allegations based upon credibility, or if he simply failed to consider the alleged side effects of the prescribed medication. Cheek's alleged side effects are critical in assessing her ability to perform certain tasks. Because the ALJ failed to address the claimant's effects of treatment, I am of the opinion that he improperly disregarded relevant evidence.

When determining whether substantial evidence supports the Commissioner's decision, it is this court's duty to consider whether the ALJ properly analyzed all the

-31-

relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co.*, 131 F.3d at 439-40. It is the court's opinion that the alleged side effects of the prescribed Valium are of particular relevance. The most common side effects of Valium are drowsiness, fatigue and ataxia, which is the loss of the ability to coordinate muscle movement. PHYSICIANS' DESK REFERENCE, 2957 (59th ed. 2005). Clearly, these types of side effects could significantly limit a person's ability to perform job-related activities. Had the side effects been considered, the ALJ's findings may have been drastically different. For instance, when considering the additional limitations, there may have been fewer jobs available, or no jobs available, within the regional and national economies for someone with those restrictions. Furthermore, had the vocational expert been posed a hypothetical containing the additional restrictions, a completely different finding may have resulted. As stated earlier, the ALJ made no mention of Cheek's alleged side effects and offered no explanation as to why the allegations were not considered. This court is not attempting to determine whether the side effects would or would not render the claimant disabled; instead, the court merely seeks to ensure that all relevant evidence is properly considered by the ALJ.

In this case, the ALJ unreasonably failed to consider the side of effects of Valium upon Cheek's ability to perform work-related activities. Thus, for the reasons stated above, I will remand this case for further consideration.

### IV. Conclusion

For the foregoing reasons, I will deny the Commissioner's motion for summary

judgment. The Commissioner's decision denying benefits will be vacated, and the case will be remanded to the ALJ for further consideration of Cheek's residual functional capacity and ability to work.

An appropriate order will be entered.

**DATED:**    This _8th_ day of January, 2008.

_Glenn M. Williams_

**THE HONORABLE GLEN M. WILLIAMS**
**SENIOR UNITED STATES DISTRICT JUDGE**

-33-